UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GEORGE MONTERO and SHARON ROSE MONTERO, husband and wife, and the marital community thereof,

Plaintiffs,

v.

WASHINGTON STATE PATROL, a Washington State Agency, KEITH JORDAN and "JANE DOE" JORDAN, husband and wife, and the marital community thereof,

Defendants.

CASE NO. C05-1092C

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiffs George Montero and Sharon Montero brought this action pursuant to 42 U.S.C. § 1983, alleging that the stop of George Montero by former Washington State Trooper Keith Jordan was without probable cause and violated his constitutional rights. After bench trial and pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact and conclusions of law:

**PROCEDURAL HISTORY**

In June of 2005, Plaintiffs brought this action against the Washington State Patrol ("WSP"), Keith Jordan ("Jordan") and his wife "Jane Doe" Jordan, alleging false arrest, false imprisonment, negligent supervision and hiring against WSP alone, negligent infliction of emotional distress, and violation of 42

ORDER – 1

U.S.C. § 1983. (Dkt. No. 1.) Jordan brought a cross-claim against WSP, alleging that he was entitled to a defense provided by the Attorney General of the State of Washington pursuant to Washington Revised Code § 4.92.060. (Dkt. No. 8.)

Defendants filed separate motions to dismiss. They each argued that Montero's claims against WSP and Jordan in his official capacity were barred by the doctrine of sovereign immunity, and that some of his claims were barred by the statute of limitations. (Dkt. Nos. 11, 12.) The Court agreed that WSP and Jordan in his official capacity were protected by sovereign immunity, and accordingly dismissed all claims against WSP. (Dkt. No. 17.) In addition, the Court found that Montero's claims against Jordan for false arrest and false imprisonment were barred by Washington's two-year statute of limitations. Wash. Rev. Code § 4.16.100(1). The Court applied Washington's catch-all three-year statute of limitations to Montero's § 1983 claim and his claim for negligent infliction of emotional distress. Wash. Rev. Code § 4.16.080(2). Finding that this statute of limitations did not begin to run until Montero received a letter from the Snohomish County Prosecutor's Office overturning his conviction, the Court found that his § 1983 claim and his claim for negligent infliction of emotional distress were not barred by the statute of limitations. (Dkt. No. 17.) Thus, the Court proceeded to trial on Montero's § 1983 claim and his claim for negligent infliction of emotional distress as against Jordan in his individual capacity.[1]

**FACTS**

**I.   Montero's Arrest**

On the evening of June 8, 2002, Trooper Keith Jordan was conducting traffic law enforcement duties for the Washington State Patrol in District 7 of Snohomish County. At around 9:50 p.m., Jordan was traveling southbound on Highway 99 in his marked patrol car when he spotted Montero's blue Ford

---

[1] As noted above, Jordan brought a cross-claim against the Washington State Patrol, alleging that he was entitled to a defense provided by the Attorney General of the State of Washington pursuant to Washington Revised Code § 4.92.060. Because the Attorney General's Office provided Jordan's representation, this cross-claim appears to be moot. In any event, Jordan did not pursue the claim at trial, and thus, it is waived.

ORDER – 2

1  pickup truck, also traveling southbound on Highway 99.

2  Montero was on his way home from a sports bar called Jimmy Mack's at the time. Montero had
3  spent two hours at Jimmy Mack's. During that time, he drank three vodka tonics before having a cup of
4  coffee and heading home. Nonetheless, he testified that he was not intoxicated during the drive home,
5  and that he was driving well.

6  Jordan testified, and memorialized in his arrest report, that Montero was weaving in the
7  right-hand lane, and crossed the fog line by more than a tire width on three occasions. As a result, Jordan
8  activated his emergency lights, causing Montero to turn into a nearby Burger King parking lot and stop.

9  Montero testified that on the evening that he was pulled over, Highway 99 was undergoing
10 extensive construction, and that there were barrels, cones, and delineators lining the highway along his
11 route. He testified that he did not hit any construction markers, which he surely would have hit if he had
12 been weaving as badly as Jordan indicated in his report. Jordan's arrest report did not indicate the
13 presence of construction markers. Jordon recalled that construction was heavy on Highway 99 that
14 summer and that the barrels moved around frequently. He testified that he likely would have included
15 that detail in his report if there had been construction markers near where he observed Montero weaving.

16 Once Montero was stopped, Jordan approached the driver's side of the vehicle and noticed an
17 odor of intoxicants coming from inside Montero's truck, and that Montero's eyes were red and watery.
18 Montero acknowledged that he had been drinking at Jimmy Mack's. With Montero's consent, Jordan
19 then administered a series of road-side driving tests intended to assess the level of Montero's intoxication,
20 including the horizontal gaze nystagmus test, the walk and turn test, and the one-leg stand. These field
21 sobriety tests showed indications of intoxication. Jordan then administered a portable breath test, which
22 indicated that Montero's blood alcohol content was 0.12, over the legal limit of 0.08. At that point,
23 Jordan arrested Montero for driving under the influence.

24 Jordan tested Montero's blood alcohol content on the BAC machine at around 10:30 p.m. and
25 again shortly before 11:00 p.m. Montero's blood alcohol content tested at 0.078 and 0.071, just below

26 ORDER – 3

the legal limit. Montero indicated that he felt the arrest was in error at the time that it occurred. Nonetheless, he was found guilty of driving under the influence by a unanimous jury.

## II.     Jordan's Resignation

Early in 2003, an attorney for the Snohomish County Public Defender's Office, Robert O'Neil, became suspicious of some of Jordan's police reports. According to O'Neil, Jordan had a reputation for long, thorough, and proficient arrest reports. Jordan's arrest reports were typically divided into subsections organized under standard headings, such as "Initial Observation," "Vehicle In Motion," etc. One such heading that he commonly included in his reports was "Booking." O'Neil's suspicions were aroused when he noticed that in one of Jordan's reports, chronicling the arrest of one Corey James Watson, the "Booking" heading instead read "Boowatson." O'Neil later found that the "Booking" heading in the arrest report for Jamen Lee Anderson read "Booanderson." The arrest report for Mr. Watson was dated January 4, 2003, and the arrest report for Mr. Anderson was dated January 9, 2003. On January 5, 2003, Jordan had drafted an arrest report for Brandon Christopher King. This led O'Neil to believe that Jordan had used the King arrest report as a template for the Watson and Anderson reports, despite the fact that the Watson report is dated the day before the King report. O'Neil filed a public records request and obtained more of Jordan's arrest reports. He did not, however, review Montero's arrest report.

In April of 2003, O'Neil addressed a memo to several individuals in the Snohomish County Prosecutor's Office, detailing his suspicions about Jordan's reports, and indicating that he intended to seek dismissal in the cases in which he was representing a party who had been arrested by Jordan for driving under the influence. O'Neil had concluded that Jordan inappropriately used boiler plate factual allegations in his arrest reports, backdated his reports, and omitted material facts bearing on his procedure and the admissibility of evidence.

Ed Stemler, one of the individuals in the Snohomish County Prosecutor's Office who received O'Neil's memo, testified that upon receipt of the memo, he pulled and reviewed approximately 150 of

ORDER – 4

Jordan's arrest reports. After this investigation, the Snohomish County Prosecutor's Office took a couple of actions. First, in May of 2003, it notified the defense counsel in all cases in which Jordan was the reporting officer, including Montero's defense counsel, of "irregularities in how a particular police officer prepared his reports." The reported irregularities included the use of templates that led to similar or identical factual assertions, errors resulting from careless use of the find-and-replace command, and improper dating of reports. The letter did not indicate that Jordan had intentionally fabricated his reports. Second, the Snohomish County Prosecutor's Office dismissed the charges in many of Jordan's pending or recently concluded cases.

The Snohomish County Prosecutor's Office was in touch with WSP about O'Neil's allegations soon after it received his memo. Robert Lenz, who was a WSP captain at the time of these events, testified that WSP decided to instigate an internal investigation into Jordan's conduct. However, on May 16, 2003, at an early meeting on the issue, Jordan abruptly decided to resign. As a consequence, the matter was not further investigated by WSP.

Jordan testified that his resignation had been the result of an accumulation of frustrations with WSP, not merely the incipient investigation into his report-writing. He later had second thoughts about his hasty resignation, and tried unsuccessfully to get his job back. He also indicated at trial that, in retrospect, he wishes an investigation had been conducted so that questions as to whether he had intentionally falsified his reports could have been put to rest.

The Court finds that Jordan credibly answered the doubts raised by Montero as to the veracity of his arrest reports. He provided an explanation as to his report-writing process that was consistent with the arrest reports submitted and the errors described in the O'Neil memo. He indicated that his report-writing style was developed based on input from a number of different individuals, including attorneys, as to what would make his arrest reports better. He conceded that he had used a series of templates for his reports, and indicated that the template he was using when Montero was arrested was quite basic. He also indicated that only the elements that did not change from case-to-case were included in his templates.

ORDER – 5

He indicated that the find-and-replace errors were "bone-headed mistakes" and described himself as "computer illiterate." Most importantly, he testified that he never wrote anything in a report that he did not believe to be accurate.

The Court finds as a factual matter that any errors in Jordan's reports were due to negligence, not intentional falsification. Careless use of the find-and-replace command in his word-processing program could explain the erroneous "Boowatson" and "Booanderson" headings. Though Montero persuasively showed that Jordan backdated one of his reports by one day, the Court cannot discern what motivation Jordan would have had to intentionally backdate the report by one day, and thus, this cannot form the basis for a finding of intentional falsification. Moreover, while the use of a template in drafting an arrest report may be ill-advised, the Court finds it easy to understand the appeal of such a system. Officers receive extensive training on the indications for drunkenness, and good officers surely develop patterns in looking for those indications while investigating a driver they suspect to be intoxicated. DUI arrests are largely routine. It is to be expected that the reports memorializing these arrests would be routine as well and that they would include some substantive similarities. The arrest reports reviewed by the Court contained similarities in organization and in elements that were unchanging from arrest to arrest. The elements that necessarily did change from arrest to arrest—such as the location of the arrest and behavior of the driver that led Jordan to pull the vehicle over—changed from report to report. Thus, the Court credits Jordan's testimony that any errors in his reports were due to carelessness, "bone-headedness," and computer-illiterance. While these errors should not, and were not, taken lightly, Montero has not made a showing that they were the result of intentional falsification.

ORDER – 6

**CONCLUSIONS OF LAW**

**I.  Section 1983 Claim**[2]

In order to show that Jordan violated 42 U.S.C. § 1983, Montero must prove by a preponderance of the evidence that "(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Johnson v. Hawe*, 388 F.3d 676, 681 (9th Cir. 2004) (internal citations omitted).  The parties do not dispute that Jordan acted under color of law.  He pulled Montero over while engaged in his official duties, in uniform, and driving his marked patrol car.

Jordan does dispute that he deprived Montero of a constitutionally protected right, however.  Montero alleges that he was driving well when pulled over, and that he gave no indications of being drunk during the road-side sobriety tests.  This boils down to an allegation that he was arrested without probable cause.  It is axiomatic that the Fourth Amendment protects a person's right to be arrested only on probable cause.  *Beck v. Ohio*, 379 U.S. 89, 91 (1964) ("Whether that arrest was constitutionally valid depends . . . upon whether, at the moment the arrest was made, the officers had probable cause to make it.").

The lawfulness of a state arrest by state police is to be determined by state law so long as the state law is not inconsistent with the Constitution.  *Ponce v. Craven*, 409 F.2d 621, 625 (9th Cir. 1969); *Bergstralh v. Lowe*, 504 F.2d 1276, 1277 (9th Cir. 1974).  Washington has adopted the position set forth in the Second Restatement of Torts § 667 that "the conviction of the accused by a magistrate or trial court, although reversed by an appellate tribunal, conclusively establishes the existence of probable cause, unless the conviction was obtained by fraud, perjury or other corrupt means."  *Hanson v. City of*

---

[2] Though Jordan did not so allege prior to trial, he argues now that he is entitled to qualified immunity.  Because qualified immunity is most saliently "an entitlement not to stand trial or face the other burdens of litigation," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), and because the Court, having completed the trial, is inclined to reach the merits, it is unnecessary to discuss the question of qualified immunity.

ORDER – 7

*Snohomish*, 852 P.2d 295, 298-99 (Wash. 1993) ("We now expressly hold that a conviction, although later reversed, is conclusive evidence of probable cause, unless that conviction was obtained by fraud, perjury or other corrupt means, or, of course, unless the ground for reversal was absence of probable cause."). While the rule set out in § 667 is applied primarily in the context of tort actions for malicious prosecution, nothing in *Hanson* indicates that it should be limited to those tort actions. In *Hanson*, the Washington Supreme Court held that the conviction of the plaintiff established probable cause as a matter of law not only for his claim of malicious prosecution, but also for his claims of false arrest and false imprisonment and his civil rights claim. *Id.* at 301; *see also Bergstralh v. Lowe*, 504 F.2d 1276 (9th Cir. 1974) (applying the § 667 rule that conviction establishes probable cause in the context of a § 1983 action that alleged an arrest was without probable cause); *Doggett v. Perez*, 348 F. Supp. 2d 1198 (E.D. Wash. 2004) (applying the *Hanson* rule in the context of a § 1983 action alleging absence of probable cause). *But cf. Fondren v. Klickitat County*, 905 P.2d 928, 934 (Wash. Ct. App. 1995) (declining to dismiss plaintiff's § 1983 claim despite the application of the *Hanson* rule because the § 1983 claim alleged constitutional violations other than the absence of probable cause). Because Montero's § 1983 claim hinges on a finding that he was arrested without probable cause, the Court finds that *Hanson* is applicable.

It is uncontested that Montero was tried and convicted by a jury. Under *Hanson*, his conviction conclusively establishes probable cause for his arrest even though it was later vacated, unless Montero can show that the conviction was obtained through fraud, perjury, or other corrupt practice. Indeed, Montero alleged that Jordan violated his constitutional rights by "making an arrest which was wrongful; wrongfully transporting Plaintiff from his automobile to jail and detaining Plaintiff; falsely testifying against him at trial; and falsifying his arrest record." (Dkt. No. 1 at 4.) However, Montero did not bear his burden of proof at trial that Montero's conviction was obtained because Jordan falsified his police report and perjured himself at Montero's trial. As is discussed above, Montero's argument that Jordan regularly falsified his police reports, as supported by O'Neil's assertions and Jordan's resignation from

ORDER – 8

1  WSP, was not sufficient to persuade the Court that the irregularities and errors in Jordan's reports were
2  due to anything more insidious than carelessness and unfamiliarity with word processing programs.
3  Montero could not point to anything in his own arrest report that indicated irregularity. Since the Court
4  found Jordan's testimony as to his report-writing practices persuasive, Montero has failed to make the
5  necessary showing that Jordan committed a wrong of constitutional proportions by knowingly and
6  intentionally pulling over and arresting Montero without probable cause, falsifying the report describing
7  Montero's arrest, and then perjuring himself at Montero's trial.

## II.     Negligent Infliction of Emotional Distress

The tort of negligent infliction of emotional distress has five elements under Washington law: first, the plaintiff must prove the traditional elements of negligence—duty, breach, proximate cause, and damage or injury. *Snyder v. Med. Serv. Corp.*, 35 P.3d 1158, 1164 (Wash. 2001). In addition, the alleged injury must meet an "objective symptomatology" requirement, *Hunsley v. Giard*, 553 P.2d 1096, 1103 (Wash. 1976), by being both "susceptible to medical diagnosis and proved through medical evidence." *Hegel v. McMahon*, 960 P.2d 424, 431 (Wash. 1998).

Montero's claim of negligent infliction of emotional distress fails on two counts. First, he is unable to show that Jordan owed him a duty. In *Keates v. City of Vancouver*, 869 P.2d 88 (Wash. Ct. App. 1994), the Washington Court of Appeals reviewed a trial court's grant of summary judgment on a plaintiff's negligent infliction of emotional distress claim against a police officer who aggressively questioned him while investigating the plaintiff's involvement in his wife's murder. The court noted that as a general rule, law enforcement activities are not reachable in negligence and that plaintiffs seeking redress for emotional distress caused by being accused of a crime usually must prove the elements of malicious persecution. *Id.* at 94. Accordingly, the court held that "police officers owe no duty to use reasonable care to avoid inadvertent infliction of emotional distress on the subjects of criminal investigations." *Id.* As noted above, Montero has failed to show that any errors in Jordan's police reports were the result of intentional falsification. Under *Keates*, Jordan has no duty to avoid the

ORDER – 9

inadvertent infliction of emotional distress that resulted from this negligence.

Second, Montero failed to introduce medical evidence in order to show that his emotional distress met the objective symptomatology requirement. *See Haubry v. Snow*, 31 P.3d 1186, 1193 (Wash. Ct. App. 2001) (holding that a trial court did not err in dismissing a negligent infliction of emotional distress claim unsupported by medical evidence). Montero presented only his own testimony as to the emotional distress he experienced as a result of his arrest, trial, and conviction. Even if medical evidence was not required, Montero did not testify as to "neuroses, psychoses, chronic depression, phobia, shock, posttraumatic stress disorder, or any other [such] disabling medical condition." *Hegel*, 960 P.2d at 431 n.5. This is plainly insufficient under Washington law.

### III.  Claims as to Plaintiff Sharon Montero

The Court concludes that George Montero has no basis for recovery. Plaintiffs have not argued that Sharon Montero, his wife, has an independent basis for recovery, and indeed, offered no evidence as to any injuries she may have suffered during this incident. Thus, the claims advanced by Sharon Monter fail as well.

### CONCLUSION

Montero has failed to show by the preponderance of the evidence that his conviction was obtained by perjury, fraud, or other corrupt means. While Jordan clearly made errors in some of his arrest reports, Montero did not show that these errors resulted from conduct more insidious than negligence, or even that any such errors were made in Montero's arrest report. Accordingly, his § 1983 claim fails. In addition, he cannot show that Jordan owed him a duty of reasonable care as a matter of law, nor did he demonstrate the objective manifestations of his emotional distress using medical evidence. Thus, his claim for negligent infliction of emotional distress must also fail.

ORDER – 10

Accordingly, and for the foregoing reasons, it is hereby ORDERED:

(1) Plaintiffs' claims are dismissed with prejudice and judgment is granted in favor of Defendants; and

(2) The Clerk of the Court is directed to enter judgment in favor of the Defendants.

SO ORDERED this 29th day of January, 2007.

*John C. Coughenour*
John C. Coughenour
United States District Judge

ORDER – 11